*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* ZAHM, Minors.

UNPUBLISHED
October 13, 2022

No. 361322
Montcalm Circuit Court
Family Division
LC No. 2020-000952-NA

Before: MARKEY, P.J., and SAWYER and BOONSTRA, JJ.

PER CURIAM.

Respondent-father appeals by right the trial court's order terminating his parental rights to his minor children, SZ and CZ. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In 2020, petitioner, the Department of Health and Human Services (DHHS or petitioner) petitioned the trial court for the removal of the minor children, SZ and CZ, from their mother's[1] and respondent-father's care following reports of verbal and physical abuse, domestic violence in the presence of the children, improper supervision, and respondent-father's significant criminal history, including that respondent-father had sexually abused another child of his, to whom he had subsequently voluntarily released his parental rights. The trial court granted the petition, and the children were placed with their maternal grandmother. Respondent-father pleaded no-contest to the allegations in the petition, and was ordered to engage with numerous services as part of his court-ordered case service plan.

Initially, respondent-father participated in every part of his case service plan, including completion of a psychological evaluation, parenting visits, parenting classes, counseling, and random drug screens. In fact, respondent-father had begun some of these services before he was

---

[1] The children's mother voluntarily relinquished her parental rights to the children in the proceedings below and is not a party to this appeal.

ordered. Because of his willing participation, the trial court expressed great hope that the children would eventually be returned to respondent-father.

In December 2020, petitioner filed an ex parte emergency motion to suspend respondent-father's parenting time after the children exhibited signs of severe trauma after parenting-time visits, as well as any time respondent-father was discussed in evaluations and counseling. CZ, for example, stood up and defecated in his pants when respondent-father was mentioned in an evaluation, began throwing and kicking items, and placed his hands around his neck and choked himself. SZ displayed dissociative behaviors when respondent-father was discussed. SZ also reported that respondent-father had downloaded pornography on her tablet, had slammed her mother's head into a wall, and has "done scary things to CZ." Both children displayed other behavioral symptoms of trauma. The trial court granted the emergency motion, but scheduled a hearing to review the issue. At the review hearing, the children's lawyer-guardian ad litem (LGAL) reported that the children were struggling with trauma-induced behavior problems, including wetting themselves both day and night and having nightmares. Once respondent-father's parenting time was suspended, however, those issues waned to some degree. The LGAL recommended that parenting time remain suspended. Petitioner reported that respondent-father was still participating in services and complying with his case service plan.

Respondent-father's parenting-time visits were suspended until June 2021, when respondent-father moved the trial court to reinstate his parenting-time, noting that he had regularly attended counseling sessions and had complied with his case service plan. The trial court ordered that supervised parenting-time visits could resume when the children's therapist recommended it. Also in June 2021, respondent-father raised an issue for the first time, arguing that he was legally blind and that DHHS had not made reasonable efforts to accommodate his disability, such as providing transportation. When this issue was raised again in July 2021, respondent-father's caseworker informed the trial court that she offered transportation to respondent-father at every family team meeting and that he always turned it down, saying that his mother already provided transportation. The caseworker noted that many other services, such as counseling, were provided virtually, and that respondent-father did not wear glasses and appeared able to read every document given to him by the DHHS.

Supervised parenting-time visits resumed in August 2021; however, in September 2021, petitioner moved the trial court to suspend parenting-time visits, stating that the children were still experiencing traumatic reactions and respondent-father was not showing any benefit from his service plan, which, by that time, included education on how to appropriately interact with the children in light of their trauma. Respondent-father had refused to allowing a parenting coach to observe visitations until after petitioner had moved to resuspend the visits.

At a review hearing in October 2021, the trial court noted that respondent-father had been charged with third-degree child abuse for the abuse of CZ that originally led to removal. Respondent-father subsequently pleaded guilty to fourth-degree child abuse and was sentenced to 75 days in jail. A DHHS caseworker called and spoke with respondent-father twice before the next scheduled court review hearing. That review hearing was held approximately two weeks before respondent-father's anticipated release from jail, but respondent-father refused to attend via telephone. At that hearing, the trial court ordered the DHHS to submit its petition for termination of respondent-father's parental rights and to cease efforts to reunify the family. The DHHS

subsequently filed a termination petition, alleging that statutory grounds for termination included MCL 712A.19b(3)(c)(*i*) and (*ii*); MCL 712A.19b(3)(g); and MCL 712A.19b(3)(j).

The termination hearing was held in April 2022. Respondent-father testified and claimed that he had spanked CZ, causing their mother to contact the police and initiate the involvement of CPS and DHHS. He further denied committing domestic violence against the children's mother. Respondent-father testified that he had participated in services, including counseling. Respondent-father also testified that he felt that the DHHS had not provided him with adequate transportation or assistance with his visual disability.

Dr. James Henry of the Children's Trauma Assessment Center, the physician that had performed the children's trauma assessment, testified that the children had experienced trauma from neglect by both parents, exposure to domestic violence, and, for CZ, physical abuse. He stated that he was "very concerned" about SZ and CZ and "found it very important to provide whatever expertise I could for the wellbeing of the kids." Dr. Henry testified that he had met with respondent-father multiple times, and that respondent-father had minimized the children's issues and claimed he had only spanked CZ, and that he himself was the victim. Dr. Henry did not recommend that the children be placed with respondent-father, stating that "it would have a traumatic emotional, psychological, and relational impact on them because their safety, psychological and physical, would be taken away. They would be constantly triggered into fight, flight or for [SZ], dissociation."

Respondent-father's caseworker testified regarding the notes from respondent-father's counselors. His first counselor noted that respondent-father tended to minimize or deflect what had happened to the children, blamed others for the situation he was in, and made himself the victim. The caseworker noted that respondent-father had switched counselors after the session in which the first counselor confronted him about this behavior. His second counselor noted that respondent-father rarely spoke about the children or their feelings, and noted further that "he was regressing or he was making minimal progress." The caseworker testified that she also believed that respondent-father continued to minimize the children's issues and had stated that child abuse laws were "bullshit." The caseworker also testified that respondent-father had begun two parenting programs, including one on trauma-informed parenting, in June 2021, but had not verified his completion of either program. Further, respondent-father had been discharged from another parenting class in August 2021 after allegedly making inappropriate comments to the DHHS employee assigned to him. Respondent-father did not work with a parenting coach program for two months in 2021, before he was incarcerated.

The children's therapist testified regarding the children's issues related to trauma, and noted that their behavioral issues and distress became significantly worse after visiting their father and improved when respondent-father's parenting time was suspended. She testified that, based on her interactions with respondent-father, he was defensive and unwilling to accept feedback.

The trial court ordered the termination of respondent-father's parental rights following the hearing, citing respondent-father's failure to benefit from the case service plan and the further harm that the children would endure if returned to his care. This appeal followed.

## II.  REASONABLE EFFORTS AT REUNIFICATION

Respondent-father argues that the trial court erred by terminating respondent-father's parental rights because the DHHS's offering of some transportation was not a reasonable accommodation, since he had requested further assistance in light of his blindness.  We disagree.

This Court reviews for clear error a trial court's factual findings.  *In re Gonzales/Martinez Minors*, 310 Mich App 426, 430; 871 NW2d 868 (2015).  A trial court's finding is clearly erroneous if this Court is left with a definite and firm conviction that a mistake was made.  *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010).  Such a mistake must be more than "maybe or probably wrong" to be clearly erroneous.  *In re Sours Minors*, 459 Mich 624, 633; 593 NW2d 520 (1999).

Absent certain aggravating circumstances, a trial court may not order the termination of parental rights until reasonable efforts on the part of petitioner have been made to reunify the family.  *In re Hicks/Brown*, 500 Mich 79, 85-86, 90; 893 NW2d 637 (2017).  For parents with a disability, reasonable efforts include modifications to a public agency's standard procedures in order to reasonably accommodate that disability.  *Id*. at 86.  Failing to offer "services designed to facilitate the child's return to his or her home" is a failure by the DHHS to provide reasonable efforts toward reunification.  *Id*.  On the other hand, if reasonable services and accommodations are offered and the parent merely fails to participate in or benefit from them, termination may proceed.  *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).  See also *In re Hicks/Brown*, 315 Mich App 251, 283; 890 NW2d 696 (2016), vacated in part on other grounds 500 Mich 79 (2017).  Termination also need not be delayed if "honest and careful evaluation reveals that no level or type of services could possibly remediate the parent to the point he or she could safely care for the child . . . ." *Id*.

In this case, despite respondent-father's claims concerning his blindness, it appears from the record that he read court documents on his own, read his homework aloud to providers, and read instructions for games during parenting visits.  More importantly, the record shows that the DHHS offered accommodations involving respondent-father's blindness from the start of the case, as documented in hearings and in its reports to the trial court.  For example, in its report in preparation for respondent-father's dispositional hearing, the caseworker and her supervisor wrote:

> Accommodations: DHHS has been providing [father] with electronic copies of all documentation and forms to review.  DHHS has been offering parenting time and service referrals in an easily accessible location for [father].  DHHS has been offering transportation assistance to appointments such as his psychological evaluation.

Further, when the caseworker asked respondent-father if he needed anything else, he said that he "pretty much [had] everything."  Although the DHHS offered transportation services to all parenting visits and appointments, respondent-father repeatedly declined the assistance, stating that his mother drove him to his appointments.  Further, many services were provided virtually.

Respondent-father's argument that the DHHS failed to reasonable accommodate his visual impairment lacks record support.  The DHHS's offerings were reasonably designed to allow

respondent-father to review documents and attend his appointments. Second, even though respondent-father indicated that having his own vehicle[2] would help him take SZ and CZ where they needed to go if returned to his care, that accommodation, if granted, would not have done anything to address the reasons that the children were removed from him in the first place. In other words, even if the accommodation had been granted, it would not have helped remediate respondent-father to the point at which he could safely care for the children, and termination did not need to be delayed. *Hicks/Brown*, 315 Mich App at 283.

Respondent-father also argues that the DHHS failed to make reasonable efforts at reunification while he was in jail. We disagree.

"The state is not relieved of its duties to engage an absent parent merely because that parent is incarcerated." *In re Mason*, 486 Mich at 152. Rather, a parent must be given a meaningful and adequate opportunity to participate in his or her service plan. *Id*.

In this case, respondent-father was able to actively participate in his case service plan for almost 17 months, including several months' worth of parenting times, before he went to jail for 75 days. Moreover, the record shows that a caseworker met with respondent-father twice while he was incarcerated. The record shows that respondent-father was provided with the opportunity to participate remotely in the single review hearing that took place while he was incarcerated, but refused to do so. The trial court ordered that reasonable efforts cease following that hearing, which was roughly two months into respondent-father's 75-day jail sentence.

Respondent-father had ample opportunities to demonstrate that he benefited from his case service plan. The record shows that the DHHS made reasonable efforts to continue providing respondent-father with services during his brief incarceration that occurred 15 months after the children were removed from his care. We conclude that the trial court did not clearly err by determining that reasonable efforts were made toward reunification despite respondent-father's period of incarceration. *In re Mason*, 486 Mich at 152.

## III. STATUTORY GROUNDS FOR TERMINATION

Respondent-father also argues that the trial court erred when it found that statutory bases existed for termination of respondent-father's parental rights. We disagree.

At a termination hearing, the petitioner bears the burden of establishing by clear and convincing evidence a statutory ground for termination of parental rights under MCL 712A.19b(3). See *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). Only one

---

[2] Respondent-father states on appeal that "[w]hile it appears that the Department [of Health and Human Services] made light of Respondent Father wanting a self-driving car, the point remained that Respondent Father needed more help." Respondent-father does not specify what, exactly, "more help" would have entailed in this context.

statutory ground for termination is required to be proven by petitioner. *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012).

The trial court terminated respondent-father's parental rights to the children under MCL 712A.19b(3)(c),[3] MCL 712A.19b(3)(g), and MCL 712A.19b(3)(j). These sections state as follows:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> (*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

MCL 712A.19b(3)(c)(*i*) applies "when the conditions that brought the children into foster care continue to exist despite time to make changes and the opportunity to take advantage of a variety of services[.]" *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014) (quotation

---

[3] Because the trial court only specified Subdivision (c) in its findings, we will analyze both Subparagraphs (*i*) and (*ii*) in the discussion.

marks and citation omitted). In order to overcome a barrier to reunification, "meaningful change in the conditions existing at the time of adjudication" must be demonstrated. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009).

MCL 712A.19b(3)(c)(*ii*) applies when there is not a reasonable likelihood that other, additional conditions would be rectified within a reasonable time given the children's ages. *In re Pederson*, 331 Mich App 445, 475; 951 NW2d 704 (2020).

In this case, the termination hearing took place well over a year after the initial disposition. See MCL 712A.19b(3)(c) (stating that the court may terminate if 182 or more days have elapsed since the issuance of an initial dispositional order). Respondent-father initially attended all evaluations and counseling services offered through the service plan, including some before they were required. The trial court stated throughout the first several months of the case that it was impressed with respondent-father's participation and hopeful that reunification would occur. However, it eventually became apparent that, although respondent-father was participating in services, he was not internalizing or implementing that knowledge. Instead, the trial court found that even though respondent-father admitted that his actions with CZ at the time of removal were wrong, respondent-father continued to minimize his own involvement in the overall scope of the children's trauma and that counseling discussions were focused on respondent-father and his situation rather than on building his relationship with the children. Further, both of respondent-father's counselors noted that respondent-father made only minimal progress.

Regarding parenting skills, the record shows that respondent-father participated in several parenting classes, although it was not verified that he completed them all, and was removed from one class for poor behavior. Respondent-father also regularly attended parenting times when offered. Service providers noted that respondent-father displayed generally appropriate parenting behaviors with the children before visits were ceased, as well as when they first resumed several months later. However, as the providers learned more about what actions triggered trauma responses in the children and identified other trends, such as respondent-father talking to CZ too immaturely and to SZ too maturely, they offered corrective feedback to respondent-father, which he did not accept, instead becoming defensive.

The trial court also considered Dr. Henry's opinion that the children had suffered complex trauma at the hands of their parents, particularly from observing and being subject to domestic violence from respondent-father. Dr. Henry also noted respondent-father's dismissive and defensive attitude towards addressing his children's trauma or modifying his own behaviors when interacting with the children.

The trial court concluded that although respondent-father had displayed some appropriate parenting skills in a general sense, he failed to accept or implement the skills he needed to successfully and safely interact with SZ and CZ specifically. Therefore, the trial court found that this barrier to reunification remained.

In short, although respondent-father participated in many services, he failed to benefit from them and make any meaningful change in his own actions involving the children. See *Frey*, 297 Mich App at 248. Without that meaningful change demonstrated, the chances for further trauma of the children remained. *Williams*, 286 Mich App at 272.

Respondent-father argues that because of parenting time being suspended as well as being placed in jail for 75 days, he did not have enough time to show that he had, in fact, benefited from the services. He further argues that more time should be given because "[t]hose who testified also agreed that rebuilding a parent-child bond can take time." However, respondent-father was given almost two years to make the necessary changes and chose not to. Further, given respondent-father's record of failing to take responsibility, defensiveness, and minimization of his children's problems, it was not likely that he would make those changes in a reasonable time, considering their age. Therefore, the trial court did not clearly err by holding the statutory grounds for termination found in MCL 712A.19b(3)(c)(*i*) or (*ii*) were proven by clear and convincing evidence.

The record evidence also supports the trial court's finding that the statutory ground for termination in MCL 712A.19b(3)(j) was proven. The reasonable likelihood of harm to children contemplated by MCL 712A.19b(3)(j) includes emotional, as well as physical, harm. *Pederson*, 331 Mich App at 473. Further, "a parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *White*, 303 Mich App at 711.

In this case, again, the trial court found that respondent-father had participated in his case service plan but did not benefit from it, and that respondent-father had not demonstrated that he was willing to implement what he learned regarding how to appropriately interact with SZ and CZ in light of the trauma that they had both experienced. Both children suffered from complex trauma from being harmed, emotionally or physically or both, before being taken and placed into care. Both exhibited concerning behaviors such as bedwetting or unusual aggression before and after parenting visits and after the children's evaluations and therapy sessions in which respondent-father was discussed. These behaviors waned when parenting-time visits ceased, but increased again when visits resumed. This pattern resumed even after the children went months without a visit.

Respondent-father argues that that it was error to terminate his parental rights when the DHHS did not provide family trauma-based therapy as recommended by Dr. Henry, because that therapy "could have gone a long way to healing the bond" between the children and respondent-father. A caseworker testified, however, that the DHHS never made the referral because the children's therapist did not yet feel that it was appropriate and that the children were not ready for it. The children's therapist also testified that she did not believe that the children were ready to engage in therapy with respondent-father, but she did recall being asked by the DHHS caseworker if she could oversee it. On the basis of this testimony, it was reasonable for the trial court to conclude that the children simply were not ready for family therapy and, therefore, that was why it was not offered. Because the trial court also found that the children were harmed every time they saw respondent-father and that respondent-father had not benefited from services thus far, it was not clear error for the trial court to order termination before that therapy took place.

Therefore, for many of the same reasons that MCL 712A.19b(3)(c)(*i*) and (*ii*) were met, and because the children already demonstrated that they suffered emotional harm every time they saw respondent-father or even heard his name, there was ample reason for the trial court to believe that the children were reasonably likely to be harmed if returned to respondent-father's care and to determine by clear and convincing evidence that MCL 712A.19b(3)(j) was met.

Because at least one statutory ground was met by clear and convincing evidence, see *Olive/Metts*, 297 Mich App at 41, the trial court did not err when it found that termination of respondent-father's parental rights was proper.[4]

## IV. BEST-INTEREST DETERMINATION

Respondent-father also argues that the trial court erred by holding that termination was in the children's best interests. We disagree.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *Olive/Metts*, 297 Mich App at 41-42. "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *Moss*, 301 Mich App at 90.

Factors that a trial court may use in determining whether removal from parents is in a child's best interests include the child's bond to his parent; the parent's parenting ability; the child's need for permanency, stability, and finality; and the suitability of alternative homes. *Olive/Metts*, 297 Mich App at 41-42. Other factors may include the parent's history of domestic violence; the parent's compliance with his or her case plan, services, and parenting-time visits; the children's well-being while in care; and the possibility of adoption. *White*, 303 Mich App at 714.

In this case, the trial court referred generally to "the file information from the date of removal to the present day" when finding that termination was in the children's best interests. Respondent-father argues that the trial court should have been more specific regarding the factors to be weighed when determining the children's best interests. However, respondent-father provides no legal support for the proposition that reversal is required when a trial court is brief in its discussion of the children's best interest. Further, *Olive/Metts* and *White* indicate that a trial court *may*, not must, consider the listed factors when making a best-interest determination. *White*, 303 Mich App at 714; *Olive/Metts s*, 297 Mich App at 41-42. The trial court did not clearly err by failing to address every specific factor separately or at length.

The record shows that when determining whether termination was in the children's best interests, the trial court stated that respondent-father either did not or could not benefit from the case service plan. The trial court noted that in counseling, respondent-father discussed his own situation instead of learning how he could help SZ and CZ or become a better respondent-father. Also, respondent-father proved to be difficult enough to work with that one provider ceased offering its services to him. The trial court added that without any benefit from the service plan, respondent-father would not be able to "[p]rovide a civil, predictable, and secure environment for the children." Although the trial court did not articulate specific factors, these reasons touched on

_____

[4] We note that the trial court did not find that respondent-father was financially able to provide proper care and custody for the children, as required by MCL 712A.19b(3)(g). Because other grounds for termination were proven by clear and convincing evidence, this error does not require reversal.

respondent-father's failure to benefit from services, which included the continuing inability to safely parent SZ and CZ or to provide security and stability.

The record also shows that children did well in placement with their maternal grandmother and that returning the children to respondent-father's care would cause them harm. Further, the record shows that both children were afraid of respondent-father, and that his mere presence was the trigger for many trauma-induced behaviors, including, in the case of CZ, fairly severe self-harm.

In sum, the record supports the trial court's conclusion by a preponderance of the evidence that it was in the children's best interests to terminate respondent-father's rights to them. Therefore, the trial court did not clearly err when it made that finding.

Nonetheless, respondent-father also argues that the trial court erred by not explicitly stating how the children's placement in relative care affected it decision to terminate respondent-father's parental rights. Further, the trial court should have considered a juvenile guardianship or should have been given more time to work on his service plan because the children were placed with their grandmother. We disagree. Unpreserved errors are reviewed for plain error affecting substantial rights. *In re Sanborn*, 337 Mich App 252, 257; 976 NW2d 44 (2021).

Although the trial court is required to consider relative placement when considering a termination petition, see *Olive/Metts*, 297 Mich App at 43, the trial court is not barred from finding termination to be an appropriate remedy even when the children are placed with relatives. Here, the trial court noted that the children were significantly traumatized by being around respondent-father and that it couldn't "find that the child [sic] being cared for by relatives is preventing the Court from ordering termination." Moreover, the trial court noted that the children were thriving in their current placement with maternal relatives. On this record, the trial court did not clearly err by giving insufficient weight to the children's placement with relatives. *Id*.

Additionally, regarding juvenile guardianship, we note that respondent-father did not raise the issue of juvenile guardianship below, nor does he develop his argument concerning the appropriateness of a juvenile guardianship on appeal or identify a specific adult that could serve as a juvenile guardian. Moreover, a trial court may create a guardianship only if it finds that the children cannot be safely returned home and that termination is *not* in the children's best interests. *In re Rippy*, 330 Mich App 350, 359-360; 948 NW2d 131 (2019); *In re TK*, 306 Mich App 698, 705; 859 NW2d 208 (2014). Here, the trial court found that termination of respondent-father's parental rights was in the children's best interests. In light of his failure to even raise the issue below, we decline to reverse on the grounds of plain error. *Sanborn*, 337 Mich App at 257.

Affirmed.

/s/ Jane E. Markey
/s/ David H. Sawyer
/s/ Mark T. Boonstra

-10-